Richard M. Resnik (RR-1407)
James S. Yu (JY 9734)
Jay W. Cho (JC-0102)
SEYFARTH SHAW LLP
620 Eighth Avenue
New York, New York 10018-1405
(212) 218-5500

Attorneys for Defendant
Lincoln Benefit Life Company Inc.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------x
G INVESTORS HOLDING LLC as successors in :
interest to STEPHEN CARB AS TRUSTEE OF :
LOLLYTOGS, INC. TRUST, :
: 09-CV-2980 (RMB)(KNF)
               Plaintiff, :
vs. :
:
LINCOLN BENEFIT LIFE COMPANY INC., :
:
               Defendant. :
------------------------------------x

## DEFENDANT'S STATEMENT OF UNDISPUTED MATERIAL FACTS PURSUANT TO LOCAL RULE 56.1

Pursuant to Rule 56.1 of the Local Civil Rules of the United States District Courts for the Southern and Eastern Districts of New York, defendant Lincoln Benefit Life Company Inc. ("Lincoln") submits this statement of undisputed material facts as to which it contends there is no genuine issue to be tried.

### I.    The Parties

1.    The original Plaintiff Stephen Carb ("Carb") As Trustee of Lollytogs, Inc. Trust ("Plaintiff")[1] is a natural person, who maintains a residence in the State of New York, County of

---

[1] Lincoln consented to a request from the insured of the policies at issue that the beneficiary of the policies be changed from Carb to an entity known as "G Investors Holding LLC", and the

New York. (Exh. A, Compl. ¶ 5; Exh. I, Deposition Transcript of Stephen Carb ("Carb Tr.") at 11-12, 33).[2]

2. Lincoln is a corporation organized and existing under the laws of the State of Nebraska with its place of business in Lincoln, Nebraska. (Exh. A, Compl. ¶ 26; Exh. B, Ans. ¶ 2).

3. Lollytogs was and is a wholesaler and distributor of children's apparel with an office and principal business located at 100 West 33rd Street, Suite 1012, New York, New York 10001. (Exh. A, Compl. ¶ 7; Exh. D, Deposition Transcript of Raymond Gindi ("R. Gindi Tr.") at 6-7).

4. Prior to December 2010, the shares of Lollytogs were owned 50% by the Sutton family and 50% by the Gindi group. (Exh. A, Compl. ¶ 27; Exh. D, R. Gindi Tr. at 6-7).

5. The named insured in this action, Samuel Gindi ("Gindi"), was a co-founder of Lollytogs and managed the day to day business of Lollytogs until the late 1990's when health

---

parties agreed to change the caption of the instant action to reflect the change of the plaintiff in this action from Carb to G Investors Holding LLC. Although the caption has been amended, for simplicity sake, except as otherwise noted, this 56.1 Statement will continue to refer to Carb as the initial Plaintiff trustee and beneficiary. By So Ordered Stipulation dated August 15, 2011, the transfer of the beneficiary from Carb to G Investors Holding LLC is not intended to change, alter or modify any of the claims or defenses in this action and/or the issues to be determined, and all previous Court Orders will be binding upon G Investors Holding LLC.

[2] The undisputed facts set forth herein are followed by citations to their support in the record, including, but not limited to, the pleadings, relevant documentation, deposition exhibits and deposition transcripts, all of which are annexed to the accompanying Declaration of Stan Shelley, dated August 24, 2011 (the "Shelley Declaration" and cited as "Shelley Decl."). Accordingly, the exhibit numbers referenced herein correspond to the exhibits annexed to the Shelley Declaration. Copies of the amended complaint, dated April 28, 2009 (the "Complaint" and cited as "Compl.") and Lincoln's answer, dated November 5, 2009 (the "Answer" and cited as "Ans.") are annexed to the Shelley Declaration as Exhibits A and B, respectively.

issues forced him to retire. (Exh. D, R. Gindi Tr. at 7, 9; Exh. C, Deposition Transcript of Richard Sutton ("Sutton Tr.") at 28-29).

6. Upon Gindi's retirement, Richard Sutton ("Sutton") became responsible for the day to day operations of Lollytogs throughout the relevant time periods involved in this action. (Exh. D, R. Gindi Tr. at 9; Exh. C, Sutton Tr. at 27-29; Exh. E, Deposition Transcript of James W. Wilson ("Wilson Tr.") at 20).

7. The Sutton family managed Lollytogs after Gindi's health deteriorated in the late 1990s but the Gindi Group continued to have a 50% ownership interest in Lollytogs. (Exh. D, R. Gindi Tr. at 9; Exh. C, Sutton Tr. at 28).

8. Raymond Gindi ("R. Gindi"), whose father co-founded Lollytogs with Gindi, is co-Chief Executive Officer of Century 21 and a partner in Lollytogs.[3] (Exh. D, R. Gindi Tr. at 12).

## II.   THE SHAREHOLDERS AND THE SHAREHOLDERS TRUST AGREEMENT

9. On or about January 1, 1993, the shareholders of Lollytogs -- the Gindi group and the Sutton family -- executed an "Amended and Restated Shareholders Agreement of Lollytogs, Ltd." (the "Shareholders Agreement"). (Exh. F; Exh. A, Compl. ¶¶ 6, 8; Exh. C, Sutton Tr. at 21).

10. The Shareholders Agreement governed the relationship between the shareholders of Lollytogs, in particular as it related to succession planning between and among the Gindi and Sutton interests. (Exh. F).

---

[3] Although R. Gindi shares the same last name as Gindi, they are not related. (Exh. D, R. Gindi Tr. at 8).

11. Paragraph TENTH of the Shareholders Agreement required Lollytogs to maintain life insurance on the life of Gindi in amounts and pursuant to a procedure set forth in the Shareholders Agreement. (Exh. F, Shareholder Agreement at 36; Exh. A, Compl. ¶ 34; Exh. D, R. Gindi Tr. at 20).

12. The proceeds of the life insurance mandated by paragraph TENTH of the Shareholders Agreement were to be applied to the contemplated buy-out of the interests of Gindi group by the Sutton family upon the death of Gindi.[4] (Exh. F, Shareholders Agreement at 36; Exh. A, Compl. ¶¶ 6, 8, 34; Exh. C, Sutton Tr. at 21, 32; Exh. D, R. Gindi Tr. at 20).

13. Simultaneously with execution of the Shareholders Agreement, the Lollytogs Shareholders executed a "Shareholders Trust Agreement" (the "Trust Agreement"). (Exh. G).

14. The Trust Agreement is intended to be the governing document regarding the acquisition of life insurance policies obligated to be taken out pursuant to the Shareholders Agreement to facilitate the contemplated acquisition of the Gindi interest by the Suttons. (Exh. C, Sutton Tr. at 21-22).

15. The trustee under the Trust Agreement is Plaintiff Stephen Carb, an attorney of more than 45 years experience in the trust and estates field, who had previously represented various member of the Sutton and Gindi families in estate planning matters. (Exh. A, Compl. ¶ 6; Exh. I, Carb Tr. at 6-7, 11-12, 33, 55).

16. Among Carb's duties and responsibilities under the Trust Agreement "were to hold the trust policies to maturity and then turn over the proceeds in accordance with the trust documents." (Exh. I, Carb Tr. at 33-34, 87; Exh. A, Compl. ¶ 35).

---

[4] Gindi is alive but did not provide deposition testimony as a result of his poor health. A copy of the affidavit of Gindi's doctor, Lucien Cote, M.D., sworn to on March 28, 2001, is attached as Exhibit H to the Shelley Decl.

17. From 1993 through 1999, pursuant to the terms of, and in satisfaction of the insurance obligations of the Shareholders Agreement, Lollytogs maintained term life insurance policies insuring the life of Gindi in various amounts. (Exh. D, R. Gindi Tr. at 27; Exh. C, Sutton Tr. at 29-30).

### III.   1999: THE POLICIES

18. In 1999, Lollytogs' shareholders sought to replace certain of the then existing term policies insuring the life of Gindi pursuant to the Trust Agreement. (Exh. C, Sutton Tr. at 41, 43; Exh. E, Wilson Tr. at 41, 42).

19. Lollytogs retained James Wilson ("Wilson"), an insurance broker affiliated with the firm of Arnone, Lowth Wilson & Leibowitz, to procure life insurance for Gindi. (Exh. C, Sutton Tr. at 41, 43; Exh. E, Wilson Tr. at 6, 41, 42).

20. Wilson has been in the insurance business since 1973 and is a Chartered Life Underwriter and Chartered Financial Consultant. (Exh. E, Wilson Tr. at 14-15, 17).

21. Wilson specializes in estate planning for high net worth families and individuals and had previously provided estate planning services and procured insurance for both the Sutton family and various members of the Gindi Group. (Exh. E, Wilson Tr. at 6, 15, 17-18, 25).

22. Sutton asked Wilson to procure term life insurance on Gindi's life and Wilson went to "virtually every company that was out there to underwrite it and see which one would be the cheapest." (Exh. E, Wilson Tr. at 42-43).

23. Wilson worked with another insurance agent, Laura Lendin ("Lendin") of Second Opinion, to assist him in finding "the best deal with the best quality company." (Exh. E, Wilson Tr. at 44, 48-49; Exh. J, Deposition Transcript of Laura Lendin ("Lendin Tr.") at 28-29).

5

24. In connection with Gindi's application for life insurance, Lendin was responsible for submitting Gindi's medical files to various insurers to obtain offers. (Exh. J, Lendin Tr. at 17, 31-32).

25. Wilson had worked with Lendin in the past and found her to be very competent. (Exh. E, Wilson Tr. at 50).

26. At the end of Wilson's underwriting process -- which involved scheduling Gindi's physicals, acquisition of doctor statements, packaging the underwriting material, running illustrations from various insurers and submission of the package to insurers -- he ultimately presented Sutton with proposals from various insurers, including Lincoln. (Exh. C, Sutton Tr. at 42; Exh. E, Wilson Tr. at 43, 47).

27. In making the decision to procure term insurance through Lincoln, Wilson testified that "cost determined everything with Lollytogs, so it was a function of what [was] the cheapest." (Exh. E, Wilson Tr. at 46).

28. In October and November 1999, Lincoln issued two (2) twenty-year term life insurance policies on Gindi's life, as the insured, with Plaintiff trustee as owner: one for $3,000,000 (the "3MM Policy") and the other for $26,000,000 (the "26MM Policy") (collectively, the "Policies"). Other than the death benefit and premium payments, the Policies are identical. (Exhs. K and L; Exh. A, Compl. ¶¶ 36-37).

29. Each Policy bears a bolded caption on the front page that states: "TERM INSURANCE TO AGE 95 POLICY." (Exhs. K and L, Policies at 1). Thus, by their terms, the Policies continue in existence until 2019, subject to Plaintiff's continued payment of premiums and compliance with other policy terms. (Exhs. K and L, Policies at 3, 9).

30. Each Policy provides for guaranteed periods of "Level Premiums" for the first ten years -- from 1999 to 2008 -- in the aggregate sum of $512,550 per year for both Policies. (Exhs. K and L, Policies at 4).

31. The level premium period expired on October 1, 2009 for the 3MM Policy and November 8, 2009 for the 26MM Policy. (Exhs. K and L, Policies at 3; Exh. A, Compl. ¶¶ 39-40).

32. Thereafter, from year 11 (i.e. 2009), when Gindi turned 85, the premiums increase substantially for each subsequent year through year 20 when Gindi would reach 95. (Exhs. K and L, Policies at 4).

33. Each Policy contains the following provision:

> Conversion Right
>
> *conversion of this policy*
>
> Prior to the earlier of the policy anniversary next following the insured's seventieth birthday or the end of the level premium period, you may convert this policy to another policy [whole life or flexible premium] insuring the life of the insured.

(Exhs. K and L, Policies at 8; Exh. A, Compl. ¶ 38).

34. The Policies were issued to Gindi when he was seventy-five years old. (Exh. A, Compl. ¶ 41; Exh. D, R. Gindi Tr. at 32; Exh. C, Sutton Tr. at 45; Exh. E, Wilson Tr. at 42).

35. The Policies also contain a provision that "[o]nly [Lincoln's] officers have authority to change this contract. No agent may do this. Any change must be written." (Exhs. K and L, Policies at 9).

36. When the Policies were issued, Wilson acknowledged that he did not read the Policies "because I sort of think I know what they say." (Exh. E, Wilson Tr. at 56).

37.     R. Gindi also never reviewed or looked at the Policies because he relied on Wilson's expertise and expected Wilson "as part of his duties and obligations as a broker, to have read the policy and been familiar with the terms." (Exh. D, R. Gindi Tr. at 24, 28, 31).

38.     Sutton relied on Wilson's expertise to tell him "everything [he] needed to know with respect to issues relating to the insurance that [Wilson] was recommending that [Sutton] take out." (Exh. C, Sutton Tr. at 44).

39.     Carb did not review the Policies. (Exh. I, Carb Tr. at 130).

**IV.    THE JULY 2000 FAX**

40.     In July 2000 -- more than nine (9) months after the Policies were issued -- Sutton asked Wilson to "inquire what conversion rights, if any, existed under the Policies." (Exh. C, Sutton Tr. at 59; Exh. E, Wilson Tr. at 57-58, 65-66).

41.     A call from Wilson's assistant to Lincoln resulted in a fax dated July 13, 2000 (the "July 13 Fax") from a customer service representative of Lincoln, Lydia Trevino, to a "Marie" at Wilson's office. (Exh. M; Exh. E, Wilson Tr. at 60, 66).

42.     The July 13 Fax states that:

> Each plan is convertible during the level premium period or to age 70, if earlier, to any whole life or flexible premiums adjustable life plan then sold by us which has a higher required premium (as of the date of conversion).
>
> When speaking with Stan Shelley, Vice President of our Customer Service Department. This policy will have conversion privileges up to the term of the policy. This is limited to what product the client may go into based on current age.

(Exh. M)

43.     The language in the July 13 Fax is not consistent with the conversion language contained in the Policies. (Exhs. K and L, Policies at 8; Exh. J, Lendin Tr. at 50, 52).

8

## V.     2003

44.     In or about February 2003, more than two years after the July 13 Fax, Lendin called Vicki Hansen ("Hansen"), a Lincoln employee, seeking clarification of the conversion rights under the Policies. (Accompanying Declaration of Vicki Hansen ("Hansen Decl.") ¶ 5; Exh. J, Lendin Tr. at 57, 149).

45.     Hansen's investigation of Lendin's inquiry, including review of the Policies and policy files, as well as discussions with her supervisor, Stan Shelley ("Shelley"), confirmed that Gindi had no contractual right to convert under the Policies since he was 75 years old at the time the Policies were entered into and issued. (Hansen Decl. ¶¶ 6-8).

46.     An internal decision was made at Lincoln to provide the insured a limited one time right of conversion to be effectuated within 30 days from February 26, 2003 (Hansen Decl. ¶ 9).

47.     Lincoln's one time, limited offer was confirmed by writing dated February 26, 2003 (the "February 26 Letter") to Lendin signed by Shelley and Hansen. (Exh. N; Hansen Decl. ¶ 9).

48.     The February 26 Letter stated, in pertinent part:

> The above policies were issued when the insured was 75, thus they would not have had the conversion option available to them due to his age. However, due to the misinformation that was provided on July 13th, 2000, we will honor a conversion of both of the policies within 30 days of this letter.

(Exh. N; Hansen Decl. ¶ 9).

49.     Neither the agents (Wilson, Lendin), the insured (Gindi), the beneficiary under the Policies (Lollytogs) nor the Trustee under the Shareholders Trust Agreement (Carb) received any objection to the February 26 Letter. (Exh. E, Wilson Tr. at 106; Exh. C, Sutton Tr. at 76, 80).

50. On or about March 12, 2003, the insured, through its agent Lendin, requested an extension of the 30-day window for conversion contained in the February 26 Letter until April 15, 2003. That extension was granted. (Exh. O; Hansen Decl. ¶ 12; Exh. J, Lendin Tr. at 66-67).

51. On April 16, 2003, the insured, through its agent Lendin, requested a further extension of the time within which to convert until June 30, 2003. That extension was granted. (Exh. P; Hansen Decl. ¶ 12; Exh. J, Lendin Tr. at 69-70).

52. In August 2003, after receiving another extension from Lincoln, Plaintiff completed the conversion of the term Policies to five separate universal life policies ("Universal Policies"). (Exh. Q; Hansen Decl. ¶ 13; Exh. C, Sutton Tr. at 85-86, 97; Exh. J, Lendin Tr. at 65).

53. In connection therewith, by checks dated September 3, 2003, Plaintiff paid Lincoln the initial premium payments for the Universal Policies. (Exh. R; Hansen Decl. ¶ 14).

54. Pursuant to the terms of the Universal Policies, Plaintiff had twenty (20) days from the delivery of the Universal Policies to exercise the right to "free look"[5] the Universal Policies. The twenty day "free look" period was scheduled to expire on September 8, 2003. (Exh. Q; Hansen Decl. ¶ 15).

55. Three days before the expiration of the twenty day free look deadline, an internal dispute surfaced between the Gindi and Sutton factions regarding the conversion of the Policies from term to universal life insurance. (Exh. T; Exh. C, Sutton Tr. at 85-86, 96; Exh. D, R. Gindi Tr. at 51-52).

---

[5] The term "free look" in insurance parlance means the period of time in which the insured has the legal right to examine a newly issued policy and return it for a full refund of premium if the policy is not satisfactory for any reason. See Hansen Decl. ¶ 15.

56. The Sutton group wanted to maintain the conversion but the Gindi group refused to consent to such conversion of the Policies. (Exh. C, Sutton Tr. at 85-86, 96; Exh. D, R. Gindi Tr. at 51-52).

57. The Gindi group did not want to pay the higher premiums that would have been required in 2003 under the Universal Policies. (Exh. D, R. Gindi Tr. at 52, 73-74).

58. As a result of Lollytogs' internal dispute, Lollytogs exercised its right to "free look" the Universal Policies and revert coverage to the term Policies. (Exh. C, Sutton Tr. at 96, 110, 113; Exh. D, R. Gindi Tr. at 91; Exh. E, Wilson Tr. at 122, 129).

59. On September 8, 2003 -- the day of the expiration of the "free look" period for the Universal Policies -- Lincoln received a letter dated September 8 (the "September 8 Letter"), purporting: (i) to be on the letterhead of; and (ii) signed by the trustee Carb, advising Lincoln that "I am utilizing my 20 day free look privilege" and "am returning these [universal life policies] back," and requesting that Lincoln "revert" the Policies back to the original term policies. (Exh. U).

60. The September 8 Letter is a forgery, was not signed or prepared by Carb and was not authorized by Carb. (Exh. I, Carb Tr. at 83-88).

61. In connection with the exercise of the "free look" provision of the Universal Policies and the reinstatement of the term Policies, the insured's agent, Lendin, by email dated September 8, 2003, contacted Hansen to initiate the rescission of the Universal Policies and reinstatement of the term Policies. (Exh. V; Hansen Decl. ¶ 17).

62. In response, by email dated September 9, 2003, Lincoln, through Hansen, advised Lendin as follows:

11

> I will get [the rescission] processed today and have the old term policies restored. Please keep in mind that the conversion we allowed on these policies was originally an error and by free looking [the Universal Policies], we will not allow a conversion in the future. I just want to make sure that everyone involved realizes that this will not be an option in the future.

(Exh. V; Hansen Decl. ¶ 18).

63. Hansen's email was forwarded to and received by Wilson's office. (Exh. V; Exh. E, Wilson Tr. at 131-132).

64. On behalf of Plaintiff, Lendin responded:

> "Thank you, everyone is very clear on this not being available in the thank [sic] future."

(Exh. W; Hansen Decl. ¶ 19; Exh. J, Lendin Tr. at 76-77).

65. After receiving the forged September 8 Letter, the request to convert was rescinded, the premiums on the Universal Policies refunded and the term Policies reinstated. (Exhs. X; Hansen Decl. ¶ 20; Exh. C, Sutton Tr. at 110, 113).

## VI. **2007**

66. By letter dated May 29, 2007 (the "May 29 Letter"), Carb wrote to Lincoln as follows:

> Please be advised that the undersigned is the owner of the above two referenced life insurance policies. It is the intention of the undersigned to convert both of these policies to permanent insurance on or before November 8, 2009, in accordance with the policies. Your cooperation in this process is appreciated. Please provide me with an illustration of the annual premiums from age 85 to age 90 based on both whole life status and UL status so that I may compare the pricing.

(Exh. AA; Exh. A, Compl. ¶ 70).

67. Lincoln responded with two letters addressed to Carb. (Exhs. BB and CC). The first letter, dated June 7, 2007, addressed generally the request in the May 29 Letter from Carb for illustrations. (Exh. BB).

12

68. The second letter dated June 14, 2007 (the "June 14 Letter") from Melanie Nobbe of Lincoln advised Carb as follows:

> I've enclosed the documents that we have in the file regarding the conversion privilege of these contracts. Because of a miscommunication in July of 2000, both of these policies were allowed to convert in 2003 to new universal policies as exceptions. However in September of 2003 those conversions were free looked and we returned the term policies to active status. Since the exceptions had already been granted, these policies no longer have a conversion privilege due to the age of the insured.

(Exh. CC; Accompanying Declaration of Melanie Nobbe ("Nobbe Decl.") ¶ 5).

69. Sutton acknowledged receiving the June 14 Letter advising that there were no conversion rights. (Exh. C, Sutton Tr. at 139-142).

70. By letter dated June 29, 2007 -- 13 days subsequent to the June 14 Letter advising that there were no conversion rights -- Sutton asked Carb to respond only to the earlier June 7 letter from Lincoln, which addressed generally the request for illustrations.

> We are in receipt of your letter dated June 7th requesting more specific information. Please provide an illustration showing a level pay of premium on Universal life insurance up to age 100.

(Exh. EE).

71. Plaintiff never replied to Melanie Nobbe's June 14 Letter. (Nobbe Decl. ¶ 6).

72. By letter dated July 5, 2007, Lincoln responded to Carb's June 29 letter and advised Carb that "[Lincoln is] unable to illustrate in force term policies." (Exh. FF).

73. By letter dated October 31, 2007, at the direction of Sutton, Carb forwarded another letter to Lincoln. (Exh. HH)

74. The October 31 letter was not drafted by Carb. (Exh. I, Carb Tr. at 129). Rather, it was prepared by the firm of Fullbright and Jaworski LLP and forwarded by that firm to Sutton to send to Carb. (Exh. I, Carb Tr. at 127; Exh. HH).

13

75. The October 31 letter provided, in pertinent part, that:

> ...it is my understanding that I have the right to convert the policies to permanent life policies of equal dollar amounts insuring the life of Sam Gindi at any time on or before November 8, 2009.

The October 31 letter concluded as follows:

> Your prompt response is appreciated. In the absence of a response I will conclude you are in agreement with my understanding, Please also specify the list of available permanent life policies into which the Policies are convertible.

(Exh. HH).

76. At the time Carb signed and sent the October 31 letter to Lincoln, he had "never looked at the underlying policies to understand ... what client's conversion rights were" and had no understanding about conversion rights at the time he sent the October 31 letter. (Exh. I, Carb Tr. at 130-131).

77. In response to the October 31 letter, by letter dated November 8, 2007, Jill Cary of Lincoln again advised Carb that "these policies are not convertible due to the insured's age" and enclosed the previous documentation sent to Carb. (Exh. II; Accompanying Declaration of Jill Cary ("Cary Decl.") ¶ 5).

78. Plaintiff never replied to Jill Cary's November 8 letter. (Cary Decl. ¶ 6).

79. Shortly before this lawsuit was filed in March 2009, Wilson's secretary, Felicia Leone, contacted Lincoln regarding conversion rights under the Policies. (Exh. JJ; Exh. E, Wilson Tr. at 163-165). Again, by email dated March 10, 2009, the insured, through its agent Wilson, was advised that the Policies "were no longer convertible due to age." (Exh. JJ).

## VII. THE COMPLAINT

80. The original complaint was filed on or about March 25, 2009 and the Complaint was filed on or about April 28, 2009. The Complaint seeks a declaratory judgment "requiring

Defendant to allow Plaintiff to convert the 3m Policy to a Whole Life Plan or Flexible Premium Adjustable Life Plan effective October 1, 2009," and "to convert the 26m Policy to a Whole Life Plan or Flexible Premium Adjustable Life Plan effective November 8, 2009." (Exh. A, Compl. ¶¶ 49, 53). The Complaint also asserts parallel claims for breach of contact.[6] (Exh. A, Compl. ¶¶ 54-63).

81. Neither the Plaintiff -- Carb-- nor the representatives of Lollytogs's shareholders -- Sutton or R. Gindi -- ever read the Complaint before it was filed. (Exh. I, Carb Tr. at 141; Exh. D, R. Gindi Tr. at 12; Exh. C, Sutton Tr. at 14-16).

Dated: New York, New York
August 29, 2011

>Respectfully submitted,
>
>SEYFARTH SHAW LLP
>
>By: s/ Richard M. Resnik
>    Richard M. Resnik (RR 1407)
>    James S. Yu (JY 9734)
>    Jay W. Cho (JC 0102)
>    620 Eighth Avenue
>    New York, New York 10018
>    (212) 218-5500
>
>Attorneys for Defendant
>Lincoln Benefit Life Company Inc.

---

[6] On September 22, 2009, United States District Court Judge Richard Berman granted, in part, Lincoln's motion to dismiss Plaintiff's claims for reformation. The Court denied that aspect of Plaintiff's motion seeking to dismiss Plaintiff's claims for breach of contract and declaratory relief. (Exh. KK).