UNITED STATES DISTRICT COURT      x
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

G INVESTORS HOLDING LLC as successors in     :
interest to STEPHEN CARB AS TRUSTEE OF     :   09-CV-2980 (RMB)(KNF)
LOLLYTOGS, INC. TRUST,     :
    : **AFFADAVIT OF**
                Plaintiff,     : **EZRA SULTAN**
         vs.     :
    :
LINCOLN BENEFIT LIFE COMPANY INC.,     :
    :
               Defendant.     :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -    x

STATE OF NEW YORK      )
                         ) ss.:
COUNTY OF NEW YORK   )

      EZRA SULTAN, being duly sworn, deposes and says:

      1.      I am CFO of Century 21, Inc. and was the representative of the Gindi family in connection with Lollytogs, Inc. ("Lollytogs")

      2.      This affidavit is submitted in opposition to the motion of Defendant Lincoln Benefit Life Insurance Company, Inc. ("Lincoln"), which seeks Summary Judgment dismissing Plaintiff's complaint.

      3.      Prior to 2010 various members of the Sutton family owned 50% of Lollytogs with the remaining 50% owned by various members of the Gindi family.

      4.      Pursuant to the 1993 Lollytogs Shareholders Agreement, Lollytogs was required to maintain life insurance on the life of Samuel Gindi. The death benefits from that policy were then to be used to fund a buyout of the Gindi family's 50% ownership interest in Lollytogs.

      5.      In 1999, I learned that Richard Sutton contacted Jim Wilson, who was a partner at Arnone, Lowth, Wilson & Leibowitz, a life insurance brokerage firm, to discuss various life insurance and estate matters.

6.      I subsequently had conversations with Mr. Wilson, Mr. Raymond Gindi and Mr. Richard Sutton regarding the procurement of these new life insurance policies . During these discussions it was impressed upon Mr. Wilson  that pursuant to the 1993 Lollytogs Shareholder Agreement, the death benefit from the life insurance policy on Mr. Gindi would be used to fund a buyout of the Gindi family's 50% ownership share in Lollytogs.  Being that Mr. Gindi was already 75 years old and would not, in all likelihood, ever be eligible for affordable insurance in the future, a policy with a conversion right was essential so as to insure that Lollytogs could fund the buyout and avoid violating any material terms of the 1993 Lollytogs Shareholders Agreement.  Therefore, a conversion right in any life insurance policy to be procured was an essential requirement .

7.      We were subsequently informed of proposals that were being offered by a number of carriers.  The proposal from Lincoln , however, was the best because it contained conversion rights which could be exercised at any point throughout the first ten years of the policy's existence .

8.      This ten-year trigger allowed the policyholder to pay term insurance premiums for ten years before converting the policies and paying more expensive whole life premiums. Accordingly, it was the policy that was selected .

9.      Consequently, on or about on or about October 1, 1999, we selected the Lincoln Policy which was made and issued to Lollytogs designated trustee, a life insurance policy bearing policy number 01T1133155 insuring his life in the amount of $3,000,000.00. On or about November 8, 1999, Lincoln made and issued to Lollytogs designated trustee a life insurance policy bearing policy number 01T1125550 insuring his life in the amount of $26,000,000.00. (collectively referred to herein as the "Policies")

10.     Full copies of the Policies were forwarded to Stephen Carb, Lollytogs designated trustee, c/o Lollytogs at 100 West 33rd Street, New York, New York in early 2000 and shortly thereafter were forwarded to me.

11.     After receipt of the Policies, I reviewed them.  In addition, I am aware that Raymond Gindi, Samuel Gindi and Richard Sutton were also shown copies of the Policies in New York.  At no time am I aware of the Policies being sent to Florida for review.

12.     After review of the Policies an issue arose as to the language triggering the conversion rights under the Subject Policies.  Specifically and notwithstanding our understanding that the Policies issued by Lincoln contained conversion rights, the Policies that we received were ambiguous as the conversion of the Subject Policies had to occur prior to Mr. Samuel Gindi reaching the age of seventy or prior to the expiration of the ten year level term premium period – whichever came first.  This became the subject of a conversation that was had with Mr. Sutton in 2000 given the fact that Samuel Gindi was 75 years old at the time the Policies were written.  Mr. Sutton subsequently requested that Mr. Wilson contact Lincoln and confirm the existence of conversion rights in the Lincoln policies  .

13.     In July 2000, in response to Mr. Wilson's request, he received a response to his inquiry regarding those conversion rights.  In a faxed letter from Lydia Trevino of the customer service department at Lincoln she represented that "[w]hen speaking to Stan Shelly, Vice President of our Customer Service Department.  [T]his policy will have conversion privileges up to the term of the policy."  This letter was subsequently provided to me and the reservation that I had regarding the clarity of the conversion rights language was unambiguously clarified.

14.     Based upon this letter from Lincoln, I had now been re-assured that the Policies contained unambiguous conversion rights which could be exercised at anytime during the ten

3

year level premium period, notwithstanding the fact that Gindi was 75 years old when the Policies were issued.  I relied upon this information as being truthful and accurate as it originated directly from Lincoln in response to our request for clarification of the conversion terms.

15.     I have been advised that Lincoln has argued to this Court in support of its Motion for Summary Judgment , that the Lincoln letter stating that "This Policy will have conversion privileges up to the term in the Policy" is "nothing more than a misquote" that is of no consequence.

16.     It is shocking to me, based upon my experience placing policies with millions of dollars of insurance coverage as the CFO of Century 21 Department Stores, that an insurance carrier would argue that it's material misrepresentation of coverage to policy holders are inconsequential and meaningless communications not intended to be relied upon as truthful by policy holders.

17.     Accordingly, I would emphatically reject this proposition being advanced by Lincoln .  Rather, it has been my experience based upon my 50 years business career that an insurance carrier has the obligation to communicate precise and accurate information when writing to its policyholders , and , that policy holders are expected to reasonably rely upon those written communications

18.     Furthermore, in this case the letter that we received was a formal written response on Lincoln benefit letterhead in response to a direct query regarding conversion privileges, which cites to Stan Shelley, who is expressly identified by his title of Vice President of Lincoln's Customer Service Department.

19.    The July 13, 2000, response was not a general statement by a Lincoln secretarial employee but rather was couched as a statement regarding "this" $29,000,000 policy that was attributed to the Vice President of the insurance company who was named in the letter.

20.    It is hard to imagine a business environment in which a critical communication of this magnitude, involving a 29 million dollar contract is dismissed as a "mere misquote" that should not have any legal significance.

21.    If Lincoln had not assured me on July 13, 2000 via the aforementioned letter, that the policy had a ten year right of conversion we would have repudiated the policy and replaced it .

22.    This July 13, 2000 fax is not the only instance in which Lincoln affirms that the policy we were sold has a conversion right.

23.    In 2002, I had discussions with Mr. Sutton and Mr. Wilson about potentially selling the Policies on the settlement marketplace.  In order to sell the Policies we asked Lincoln to provide a policy illustration.

24.    Lincoln's agent advised us unequivocally that "this policy is able to be converted to a permanent product"

25.    In response to this request, on December 12, 2002, Mr. Wilson's executive assistant, Lilly Phan, received a response via e-mail from Kourtney Harris, a Policy Owners Service Specialist at Second Opinion, an agent of Lincoln's, which indicated that "[a]s per Jodi [Spicer] @ Lincoln Benefit, this policy is able to be converted to a permanent product".  This email was subsequently forwarded to me.

26.    It was not until September of 2003 that Lincoln for the first time  reversed field and  informed us that the policy that had been sold to us in 1999 did noy have conversion rights

and that  it had made a mistake when it informed us that conversion rights were available during the ten year term of the Policies.  At this time Lincoln offered Lollytogs the option of converting , but such a conversion had to take place in 2003 which would have required us to pay an additional six million dollars in premiums over the remaining term of the contract.

27.     If in fact we had been told in 2003 that the Lincoln policy would have cost an additional six million dollars in premiums we would not have purchased the Lincoln Policies.

28.     It was my feeling, in September 2003 , , when Lincoln proposed that we pay an additional six million dollars in premiums for the conversion rights that we were now being told that we had to exercise in at that time , rather than at the end of the ten year term , that we were the victims of a bait and switch tactic .   I decline to do accept this proposal because it was a change from what had been agreed to , and , clearly represented to us; to wit:  that "this policy will have conversion privileges up to the term of the Policy

29.     It was also my belief that an insurance carrier should not be allowedto change the change the terms to enrich itself by six million dollars as a means of ameliorating what they have now characterized as their mistake made years before .

30.     I also felt that since Mr. Gindi was now approaching 79 years old and his health was had not improved, we no longer had the same options available to us as we did in 1999 or in 2000 when we had been told in writing by Stan Shelley, the vice President of the Customer Service Department that "this policy will have conversion privileges up to the term of the Policy"

31.     After consultation with Mr. Gindi and Mr. Sutton, and within the time frame provided by Lincoln, Lincoln's compromise offer was rejected given the differential in premium

between the level term and the Whole Life premiums that would be paid between 2003 and 2009, roughly an additional $6 Million.

32.     Since Mr. Gindi was still alive and well in 2003 there was no issue at that point that would have been ripe for judicial intervention since if Mr. Gindi passed prior to the expiration of the ten year term the conversion rights would never need be exercised.

33.     Accordingly, while I have been advised that Lincoln has alleged in its moving papers that we are "gaming the system" I would reject that pejorative characterization. Rather, upon the advice of counsel we determined that any dispute that we had with Lincoln in 2003, regarding their efforts to extort a six million dollars surcharge from us under the threat of losing conversion rights at the end of the term, was not ripe for judicial review since Mr. Gindi's passing prior to the end of the term would render conversion a moot point.

Ezra Sultan

Sworn to me on this
20 day of Sept, 2011

Notary Public

ANTOINETTE MARIE COLOREO
Notary Public, State of New York
No. 01CO6194107
Qualified in Kings County
Commission Expires September 29, 2012

7

Docket No 10-CV 2980

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

STEPHEN CARB AS TRUSTEE OF
LOLLYTOGS, INC. TRUST

Plaintiff,

-against-

LINCOLN BENEFIT LIFE COMPANY, INC.,

Defendant.

AFFIDAVIT OF EZRA SULTAN

*Weg and Myers, P.C.*
Attorney for Plaintiff

Office and Post office Address, Telephone
Federal plaza
52 Duane Street
NEW YORK, NEW YORK 10007
(212) 227-4210