UNITED STATES DISTRICT COURT
SOUTHER DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
G INVESTORS HOLDING LLC as successors in
interest to STEPHEN CARB AS TRUSTEE OF    :   09-CV-2980 (RMB)(KNF)
LOLLYTOGS, INC. TRUST,                    :
                                          :   **AFFADAVIT OF**
                    Plaintiff,            :   **RICHARD SUTTON**
            vs.                           :
                                          :
LINCOLN BENEFIT LIFE COMPANY INC.,        :
                                          :
                    Defendant.            :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

State of New York   )
                    ) ss.:
County of New York  )

RICHARD SUTTON, being duly sworn, deposes and says:

1. I am a shareholder and the CEO of Lollytogs, Inc., ("Lollytogs") a company that sells children's clothing with its primary place of business in New York State.

2. This affidavit is submitted in opposition to the motion of Defendant Lincoln Benefit Life Insurance Company, Inc. ("Lincoln"), which seeks summary judgment dismissing Plaintiff's complaint.

3. Prior to 2010 various members of the Sutton family owned 50% of Lollytogs with the remaining 50% owned by various members of the Gindi family.

4. Pursuant to the 1993 Lollytogs Shareholders Agreement, Lollytogs was required to maintain life insurance on the life of Samuel Gindi. The death benefits from that policy were then to be used to fund a buyout of the Gindi family's 50% ownership interest in Lollytogs.

5. In 1999 I met with Jim Wilson who was a partner at Arnone, Lowth, Wilson & Leibowitz, a life insurance brokerage firm specializing in estate planning, in order to discuss policy and estate matters. Previously, Mr. Wilson had procured insurance

policies on behalf of parents, as well as various members of both the Gindi family and the Sutton family.

6.   During the course of our conversation we discussed the insurance policies in place on the life of Mr. Gindi.  Mr. Wilson believed that premiums being paid on Mr. Gindi's policies were excessive and believed he could procure a better product.  After discussions with Mr. Gindi and Ezra Sultan, CFO of Century 21, Inc., I requested that Mr. Wilson procure life insurance on the life of Samuel Gindi.

7.   During my conversations with Mr. Wilson, Mr. R. Gindi and Mr. Sultan regarding the procurement of these new life insurance policies, I explained to Mr. Wilson that pursuant to the 1993 Lollytogs Shareholder Agreement, the death benefit from the life insurance policy on Mr. Gindi would be used to fund a buyout of the Gindi family's 50% ownership share in Lollytogs.  Being that Mr. Gindi was already 75 years old and would not, in all likelihood, ever be eligible for affordable insurance in the future, a policy with a conversion right was essential so as to insure that Lollytogs could fund the buyout and avoid violating any material terms of the 1993 Lollytogs Shareholders Agreement. Therefore, a conversion right in any life insurance policy to be procured was an essential requirement that I communicated to Mr. Wilson prior to him attempting to procure a life insurance policy on Mr. Gindi's life.

8.   After collecting the required information preparing the application and submitting the application to various insurance carriers, Mr. Wilson obtained life insurance policy proposals from several insurance companies including Lincoln.

9.   The proposal from Travelers Insurance Company contained a five year conversion right; the proposal from North American Company for Life and Health

provided a three year conversion right and the proposal from Midland Insurance Company, provided a two year conversion right. The Lincoln proposal contained conversion rights which could be exercised at any point throughout the first ten years of the policy's existence.

10. In my subsequent discussion with Mr. Wilson he recommended that Lollytogs select the Lincoln policies based upon the policies ten-year conversion rights trigger. This ten-year trigger allowed the policyholder to pay term less costly insurance premiums for ten years before converting the policies and paying more expensive whole life premiums.

11. Lollytogs followed this advice and consequently on or about October 1, 1999, Lincoln made and issued to Lollytogs designated trustee, a life insurance policy bearing policy number 01T1133155 insuring the life of Samuel Gindi in the amount of $3,000,000.00. On or about November 8, 1999, Lincoln made and issued to Lollytogs designated trustee, a life insurance policy bearing policy number 01T1125550 insuring the life of Samuel Gindi in the amount of $26,000,000.00. (collectively referred to herein as the "Policies")

12. Full copies of the Policies were forwarded to Stephen Carb, Lollytogs designated trustee, c/o Lollytogs at 100 West 33rd Street, New York, New York in early 2000 and shortly thereafter were forwarded to me.

13. After receipt of the Policies, I reviewed them. In addition, I am aware that Raymond Gindi, Samuel Gindi and Ezra Sultan were also shown the Policies at their respective addresses in New York. At no time am I aware of the Policies being sent to Florida for review.

14. After review of the Policies an issue arose as to the language triggering the conversion rights under the Subject Policies. Specifically and notwithstanding our understanding that the Policies issued by Lincoln contained conversion rights, the Policies that we received suggested that the conversion of the Subject Policies had to occur prior to Mr. Samuel Gindi reaching the age of seventy or prior to the expiration of the ten year level term premium period – whichever came first. This became the subject of a conversation that I had with Mr. Sultan in 2000, given the fact that Samuel Gindi was 75 years old at the time the Policies were written. Therefore, I requested that Mr. Wilson contact Lincoln and confirm the existence of the Policies conversion rights.

15. In July 2000, Mr. Wilson forwarded me a response to his inquiry regarding those conversion rights. In a faxed letter from Lydia Trevino of the customer service department at Lincoln she represented that "[w]hen speaking to Stan Shelly, Vice President of our Customer Service Department. [T]his policy will have conversion privileges up to the term of the policy."

16. Based upon this letter from Lincoln, I continued to pay premiums on the Policies because I had been re-assured that the Policies contained conversion rights which could be exercised at anytime during the ten year level premium period, notwithstanding the fact that Samuel Gindi was 75 years old when the Policies were issued.

17. If Lincoln had indicated at that time that the Policies did not provide conversion rights, I would have directed Mr. Wilson to cancel the Lincoln Policies and replace them with new insurance policies that had conversion rights.

18. In 2002, although I was unaware the Gindi family was soliciting sale options, I independently had discussions with Mr. Wilson about potentially selling the

Policies on the settlement marketplace. In order to sell the Policies I sought to obtain updated confirmation regarding conversion of the policies.

19. Therefore, I requested that Mr. Wilson contact Lincoln and confirm again the existence of conversion rights under the Policies. On December 12, 2002, Mr. Wilson's executive assistant, Lilly Phan, received a response via e-mail from Kourtney Harris, a Policy Owners Service Specialist at Second Opinion, an agent of Lincoln's, which indicated that "[a]s per Jodi [Spicer] @ Lincoln Benefit, this policy is able to be converted to a permanent product". This email was subsequently forwarded to me. However, after additional discussions, Lollytogs elected not to sell the Policies.

20. My next communication on this subject with Mr. Wilson took place in 2003. At that time I requested that Mr. Wilson obtain illustrations reflecting the schedule of premiums associated with converting the Policies to whole life if we chose to convert the Policies at that time.

21. In response to the request for illustrations Lincoln, responded with a letter to Mr. Wilson dated February 26, 2003 wherein it now indicated for the first time that the Policies did not permit conversion, due to Mr. Gindi's age. However, the letter went on to state that Lincoln would honor the policy holder's conversion right on the Policies as long as it was exercised within the next thirty days.

22. Based upon my concern that if I failed to exercise the conversion right in 2003 such right would be lost and I would not be able to subsequently obtain insurance coverage for Mr. Gindi, in August 2003, I completed the application in connection with a possible conversion of the Policies.

23.     However, in September 2003 after consultation with Mr. Sultan and other members of the Gindi family and in the time frame provided by the proposed Policies, I rejected Lincoln's offer to convert the policies 5 ½ years before such a conversion could be exercised.

Richard Sutton

Sworn to me on this
20 day of Sept., 2011

Notary Public

Jeffrey S. Dweck
Notary Public, State of New York
Reg. No. 02DW5072837
Qualified in Kings County
Commission Expires Feb. 10, 2015

Docket No 10-CV 2980

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

STEPHEN CARB AS TRUSTEE OF
LOLLYTOGS, INC. TRUST

Plaintiff,

-against-

LINCOLN BENEFIT LIFE COMPANY, INC.,

Defendant.

AFFIDAVIT OF RICHARD SUTTON

*Weg and Myers, P.C.*
Attorney for Plaintiff

Office and Post office Address, Telephone
Federal plaza
52 Duane Street
NEW YORK, NEW YORK 10007
(212) 227-4210